## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL D. CROSS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-1253 (RMC)** |
| ) | |
| **LAWRENCE M. SMALL,** ) | |
| ) | |
| **Secretary,** ) | |
| **Smithsonian Institution,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Michael Cross was hired as a Museum Specialist with the National Air & Space Museum ("NASM"), a unit of the Smithsonian Institution, on April 23, 2001. Pl. Facts[1] ¶ 1. He was assigned to the Museum's Paul E. Garber Preservation, Restoration, and Storage Facility (the "Garber Facility") in Suitland, Maryland, where he and other employees restored aircraft, spacecraft, and other artifacts in preparation for the opening of the Museum's companion facility, the Udvar-Hazy Center. *See* Am. Compl. ¶ 10. Mr. Cross was terminated on April 12, 2002, about two weeks before his one-year probationary period would have ended. Pl. Facts ¶ 2.

Claiming that he was fired in retaliation for protected Equal Employment Opportunity ("EEO") activity, Mr. Cross sues Lawrence Small, Secretary of the Smithsonian Institution, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2005), and the First and Fifth Amendments. Before the Court is the Defendant's Motion for Summary Judgment

---

[1] Plaintiff's response to Defendant's Statement of Material Facts Not in Dispute [Dkt. #18].

as to Counts 1–3 of the Amended Complaint,[2] which allege a retaliatory hostile working environment, retaliatory discharge, and retaliatory negative references under Title VII. For the reasons explained below, the Court will grant the Defendant's motion in part and deny it in part.

## I. FACTUAL BACKGROUND

Mr. Cross was hired by William Reese, Chief of the Museum's Preservation and Restoration Unit, Pl. Facts ¶ 3, who supervised him throughout his tenure at the Garber Facility. Am. Compl. ¶ 11. Mr. Cross began work in April 2001 and, by all accounts, his early performance was entirely satisfactory. *See* Pl. Facts ¶ 1; Def. Mem. at 2. In September 2001, Mr. Reese rated Mr. Cross's performance as "outstanding." Pl. Facts ¶ 5. Colonel Tom Alison, Mr. Reese's immediate supervisor and the Manager of the Garber Facility, concurred with this assessment. Pl. Exh.[3] 1. In January 2002, Mr. Reese recommended that Mr. Cross's employment be continued past the end of

---

[2] Mr. Cross's original Complaint, filed July 27, 2004, also alleged these three claims, numbered as Counts 2–4, in addition to a claim of discrimination in terms/conditions of employment, numbered as Count 1. Defendant's Motion for Summary Judgment, filed November 18, 2004, addresses each of these four claims. On March 7, 2005, Mr. Cross contemporaneously filed an opposition to Defendant's Motion and a motion for leave to amend his complaint, which the Court granted. Mr. Cross's Amended Complaint, filed March 8, 2005, struck the original Count 1, renumbered Counts 2–4 as Counts 1–3, and added his constitutional claims as Counts 4–5. Rather than filing a new motion for summary judgment in response to the Amended Complaint, Defendant filed a Reply in support of his original Motion for Summary Judgment. That Reply addressed the extant Title VII counts as well as the new constitutional counts. Mr. Cross has not filed a sur-reply in support of his constitutional counts.

Because Counts 1–3 of the Amended Complaint are identical to Counts 2–4 of the original Complaint and are now completely briefed, the Court considers them ripe for decision. However, because Mr. Cross has not had — or, rather, taken — the opportunity to respond to Defendant's attacks on his constitutional claims, the Court does not consider those claims ripe. Instead, the Court construes Defendant's Reply as a motion to dismiss or, in the alternative, for summary judgment on the constitutional claims, and for now defers decision on them. The balance of this opinion refers to the counts as numbered in the Amended Complaint.

[3] Exhibits to Plaintiff's Opposition to Defendant's Motion to Dismiss [Dkt. #18].

the probationary period, Pl. Facts ¶ 5, and on February 19, 2002, Mr. Reese recommended that Mr. Cross receive a within-grade pay increase, indicating that his performance showed an "Acceptable Level of Competence," Am. Compl. ¶ 13; Pl. Exh. 3.  Not quite two months later, on April 12, 2002, Col. Alison discharged Mr. Cross during his probation period, citing two reasons: poor attendance and misconduct.  Pl. Exh. 6.

What changed, exactly, between Mr. Cross's favorable reviews as late as February 2002 and his termination in April 2002 is the subject of some disagreement.  While the Government has submitted a statement of undisputed material facts pursuant to Local Civil Rule 7(h), the majority of that statement, it turns out, is disputed by Mr. Cross, and is therefore unusually unhelpful in crafting a cohesive narrative.  Nonetheless, by reviewing those facts about which the parties do agree and the numerous documents now part of the record, the Court is able to provide an outline that places the controversy in context.

For several months before Mr. Cross's discharge in April 2002, there was unease among many of the employees in the Garber Facility — mostly, it appears, the result of personality conflicts and certain management practices.  One of the employees' major issues concerned the treatment of Heather Hutton, who, like Mr. Cross, was a Museum Specialist at the Garber Facility. Beginning in June 2001, Ms. Hutton was apparently the recipient of unwanted advances from two nonsupervisory coworkers, and later had a romantic relationship with a third nonsupervisory coworker, John Curry, that ultimately soured.  *See, e.g.*, Pl. Exh. 10B at 1-2.  Fallout from the latter relationship led to some tension on the shop floor which, according to Ms. Hutton, escalated into accusations, fueled by Messrs. Curry and Reese, that Ms. Hutton's interactions with her male coworkers were inappropriate and disruptive to shop morale.  *See, e.g.*, *id.* at 2-3.  These accusations,

among other complaints, were the subject of a separate EEO charge eventually filed by Ms. Hutton.

Pl. Exh. 10A.

Another prime employee concern was Mr. Reese's management style. Several

workers complained that Mr. Reese gave preferential treatment to favored employees, shunned

employees who had fallen out of his good graces, intimidated the workforce, and dealt poorly with

female staff members. Not all employees shared these concerns, but the feelings of Robert McLean

appear typical. He stated in his affidavit that:

> Our goal in complaints against management was that we did not want
> Bill Reese as a supervisor, or in our chain of command. I believe that
> Mr. Reese and later Mr. Alison betrayed the trust placed in them by
> the Smithsonian Institution, and by their employees, by abusing their
> privileges and staff in a regular and obvious manner, to include
> intimidation, harassment, humiliation, isolation, conspiracy,
> deception and sexual harassment and sexual discrimination, extreme
> and overt forms of favoritism and cronyism, including the filling of
> several vacant position primarily from their circle of friends, and
> assigning friend/employees/cronies choice of travel, level of pay, and
> choice of assignments.

Pl. Exh. 11 (McLean Aff.) at 6. Both issues — the treatment of Ms. Hutton and Mr. Reese's

management style — apparently came to a head in early 2002. Mr. Cross's role in addressing them

is the focus of the present dispute.

On February 2, 2002, Mr. Cross initiated what he describes as his "EEO activity" by

contacting Chandra Heilman, the Smithsonian's Ombudsman.[4] Pl. Exh. 32 (Cross Aff.) ¶ 23. In his

first memorandum to Ms. Heilman, which bears the subject "ILLEGAL[] SHOP MANAGEMENT

PRACTICES AT NASM-GARBER FACILITY" but no date, Mr. Cross complained that nine

---

[4] The record leaves unclear why Mr. Cross chose to contact Ms. Heilman, the Smithsonian
Ombudsman, rather than John Benton, the NASM Ombudsman.

practices were routinely accepted as "normal" at the Garber Facility:

1. Personal and [p]rofessional [s]landering with intent to jeopardize income
2. Deliberate and willful disruptive shop management, hindering efficient production levels
3. Sexual and [e]thnic harassment and biasing, [w]ith deliberate and willful intent to restrict legal freedoms
4. Unfair and unethical hiring and shop management support practices
5. Inefficient, resource wasteful, and dangerous shop management by personnel isolation
6. Inability to use [c]hain-of-[c]ommand to resolve in-house issues
7. Verbal abuse and unprofessional emotional outbursts bordering on deliberate employee intimidation
8. Deliberate withholding of management assistance with bureaucratic/payroll problems
9. "Punishment" by isolation, public degrading, and denial of earned NASM benefits, for not participating with supervisor in non-work activities

Pl. Exh. 7A (undated memo) at 1. The memorandum listed nine "suggested action" steps, including the transfer of Mr. Reese to another facility. *Id.* at 2.

In an undated, two-page follow-up memo to Ms. Heilman, with the subject line "requested updates," Mr. Cross suggested that Mr. Reese was aware that somebody had contacted the Ombudsman about "the case" and was questioning staff to determine which "conspirators" were responsible for the "mutiny." Pl. Exh. 7B (undated memo) at 1. That memo also related that Mr. Curry had confronted Ms. Hutton in an "intimidating[]" manner in the parking lot after work. It elaborated: "Heather is VERY scared. She has contemplated quitting and leaving the area out of fear of both Bill Reese and John Curry's anger when the case is brought to light." *Id.* at 2.

In a third, also undated memo to Ms. Heilman, bearing the subject line "further details," Mr. Cross provided specific examples of each of the nine categories of inappropriate

practices listed in his first memo.  Specifically, with respect to the third category, "[s]exual and

[e]thnic harassment and biasing," Mr. Cross stated, among other things:

- I have he[a]rd [Mr. Reese] say, in reference to Heather Hutton . . . that "the c _ _ _ t [sic] used Bobbie to get the job."

- Mr. Reese (per his management style) had one of his top "A" team members [i.e., his favored employees] tell me and Mr. Kautner directly that we were "not to associate[] with Ms. Hutton outside of the shop, she was bad news."  We were also told she had filed charges on 4 male members of our shop for Sexual Harassment.

- I feel, from Mr. Reese['s] daily mannerisms, he finds females "inferior."

- As for Mr. Curry, I have had him brag to me about his "conquest" of Ms. Hutton in a derogatory manner.

- It is my belief, supported by Mr. Reese's actions, that he has deliberately put Ms. Hutton[']s physical being "at Risk" by immediately putting her on the same crew as Mr. Curry.[]  This forc[es] Ms. Hutton to work with a person he knowingly is sure [sic] to further harass and intimidate her.

Pl. Exh. 7C (undated memo) at 1.  This letter also made specific allegations about drug use by

Messrs. Reese and Curry.  For example, it asserted that "Mr. Reese's behavior is very indicative of

'Cocaine' use.  This is a habit he is known to have had, and [he] may still be under its influence.  I

state 'maybe' due to my knowledge of his Pot use."  *Id.* at 1.  Similarly, it alleged that "Mr. Reese's

hiring of Mr. Curry is linked to the fact [that] they both smoke pot.  Mr. Curry has been noticed by

[coworker] Bill Stevens[]on to be under the influence of pot at work."  *Id.* at 2.  The memo further

asserted that Mr. Curry "possesses tendencies for violence."  *Id.* at 1.

Ms. Heilman was the recipient of the bulk of Mr. Cross's complaints, but at some

point in late February or early March 2002, Angela Roybal, a Senior EEO Program Manager in the

Office of Equal Employment and Minority Affairs ("OEEMA"), was brought into the loop.  *See* Pl.

Exh. 7d (Feb. 28, 2002, email from Ms. Heilman to Bob McLean) ("Angela Roybal from OEEMA

will call Heather tonight.  Mike told me that Heather did not want to call from work."); Def. Exh.

24 (Roybal Aff.) ¶ 6 (noting her attendance at a March 11, 2002, meeting at the Garber facility).  In

early March, John Benton, the NASM Ombudsman, also became involved in addressing the Garber

employees' complaints.  Roybal Aff. ¶ 6 (noting his attendance at the March 11, 2002, meeting); Pl.

Exh. 7G (Mar. 21, 2002, email from Mr. Benton to Ms. Heilman).

On March 5, allegedly prompted by "personal concern for [his] safety and that of [his]

coworkers," Pl. Exh. 32 (Cross Aff.) ¶ 27, Mr. Cross sent the following email to Ms. Heilman:

> Chandra,
>
> I am sorry to have been picked to send you this news but it is a
> majority consciences [sic] Mr. Small be notified immediately
> concerning our predicament.  The ladies in the shop are AFRAID
> NOW, while several of us men feel we have to watch over our
> shoulder constantly.   We have placed before you over 18,
> professional, employees with excellent performance records
> documented as being in jeopardy with no action taken in almost a
> month.  With each day our fears and risks increase while Bill Reese
> and his people clean up and cover their tracks.  We have pleaded with
> you to get someone on this asap without any response.  Today Ms.
> McCombs had to be taken to the doctors for sever[e] chest pains (that
> turned out the be a case of "anxiety attack["].]   Ms. Hutton was
> jumped by Tom Alison today, who demanded to know who the other
> parties were.  This along with the escalating shop anger, foul looks
> and insinuations abounding around the shop, we feel it is better to be
> fired or quit than to risk injury or property damage.  Two people (Bob
> McClean and Ed Mautner) have each asked me if I was aware Bill
> Reese carries a gun and felt compelled to inform me that they thought
> he may be capable of using it.  I don't know what possessed them to
> tell me this but I certainly do not take it as a sign of confidence on
> their part for Bill[']s judgment.  We are afraid for Heather to the point
> we are rotating shifts to stay with her later after hours for protection.
> Bob McClean is on tonight, [m]y turn tomorrow[,] and Dave Wilson

is on both nights.  If this type of situation is so common in the Smithsonian that no one is concerned enough to investigate quickly then maybe we should have gone to outside sources in the first place. I am sure you have tried your best but right now we, your prize employees at Garber[,] feel people[']s safety overrides protocol.

Sincerely,

    a.   A. McCombs
    b.   R. McLean
    c.   W. Lee
    d.   E. Mautner
    e.   D. Wilson
    f.   H. Hutton
    g.   B. Rector
    [h].  R. Weihrauch
    [i].  R. Horigan
    m.  Myself

Pl. Exh. 7F (Mar. 5, 2002, 4:54 p.m. email from Mr. Cross to Ms. Heilman).  The same day, Mr. Cross forwarded the same message to Lawrence Small, Secretary of the Smithsonian Institution, with the following introductory text:

Mr. Small,

It is with great trepidation that you are contacted.  I have jumped the chain of command but feel justifiably [sic] so doing.  Our institution is at stake.  We have a situation within our walls that possess[es] crippling potential.  Please contact your Ombudsperson [C]handra Heilman for details.  Over 60% of your restoration people (all w/ perfect performance reviews) have brought to her attention a situation that has the potential of spiraling out of control, fast!  You're our final, in house, hope.  I have enclosed a copy[] of our last email to her, for edification.

Pl. Exh. 7E (Mar. 5, 2002, 11:29 p.m. email from Mr. Cross to Mr. Small); Pl. Facts ¶ 11.  The apparent signatories other than Mr. Cross promptly contacted management to deny having given Mr. Cross permission to append their names.  Pl. Facts ¶ 13.

This email was also sent to General Jack Dailey, Director of NASM, and Don Lopez, Deputy Director of NASM.  *See* Pl. Exh. 15 (Dailey Dep.) at 96 (noting that Gen. Dailey read the email).  The next day, March 6, Mr. Lopez forwarded the email to Col. Alison with the note, "I don't know if you have seen it but they really bypassed a number of supervisory steps."  Pl. Exh. 7E.[5] Either that day or the next, Col. Alison informed Gen. Dailey that he and Mr. Reese "spent quite a bit of time with the [Smithsonian's] ombudsman, Chandra Heilman" and Angela Roybal, the "EEO representative."  Pl. Exh. 4 (Alison Dep.) at 321-22.  During that meeting, Ms. Heilman revealed that one of the allegations was that Mr. Reese had used derogatory terms, including the word "cunt," in reference to certain female employees.  *Id.* at 324-25.

On March 11, Col. Alison held a meeting at the Garber Facility to allow the employees to voice their concerns.  Ms. Heilman, Mr. Benton, and Ms. Roybal, as well as several shop employees, including Mr. Cross, were in attendance.[6]  Pl. Exh. 7H; Roybal Aff. ¶ 6.  Regarding

---

[5] The record suggests that Mr. Cross's March 5 email led Col. Alison to believe that Mr. Cross was "part of a group that said that [Ms. Hutton] was being harassed."  Pl. Exh. 4 (Alison Dep.) at 168.  Col. Alison further testified:

> Q. Did they appear to be concerned about [Ms. Hutton] being sexually harassed?
> A. I'm not — I don't remember the term "harassment" being used.
> Q. Was that your understanding of what they were concerned about?
> A. Well, I guess it would probably.

*Id.* at 169.

[6] There may have been a second meeting, similar in scope to the March 11 meeting, on or about March 25.  *Compare* Pl. Exh. 18 (McCombs Aff.) ¶ 4 (suggesting that the employees voiced their concerns to Col. Alison, Ms. Heilman, Ms. Roybal, and Mr. Benton on March 25) *with* Pl. Exh. 32 (Cross Aff.) ¶ 35 (indicating a similar such meeting on March 21 and 22).  It is unclear whether the references to March 11, March 21-22, and March 25 actually refer to different meetings or the same meeting.  Neither party has alleviated this confusion by providing a useful chronology of the pertinent events.

this specific meeting, Ms. Roybal indicated in her affidavit that she "d[id] not recall Michael Cross making any allegations of sexual harassment, disability discrimination, or retaliation for protected EEO activity." Roybal Aff. ¶ 6. Though it is unclear whether she was speaking of the same meeting or more generally, Ms. Heilman testified in her deposition as follows:

> Q. . . . Did you perceive Mr. Cross to be assisting Ms. Hutton in her effort to raise the issue that she felt threatened by John Curry?
> . . . .
> A. He brought up that situation along with others.
> . . . .
> Q. Did you perceive Mr. Cross to be assisting Ms. Hutton in her efforts to raise the situation regarding Bill[ Reese]'s treatment of her . . . ?
> A. He was raising concerns overall.
> Q. Overall, but specifically about Mr. Reese's treatment of Heather Hutton[?]
> . . . .
> A. It was one of the concerns he raised.
> Q. And did he also appear to raise the concern about how Bill Reese was handling potential sexual harassment situations?
> A. I don't remember that being raised.
> Q. Did Mr. Cross also appear to be one of the people raising the concern that Mr. Reese had a problem with women?
> A. I don't remember that he was the one.
> Q. Well, you said that he was one of the people raising all of the concerns; isn't that one of the concerns you're referring to?
> A. Based on the memos we just read, he did raise all of those concerns.

Pl. Exh. 8 (Heilman Dep.) at 263-64. All told, between twelve and fifteen Garber staff members registered their concerns about management with Ms. Heilman. Pl. Exh. 12 (Wilson Aff.) ¶ 8 ("[Mr. Cross] was part of a group of about twelve employee[]s from the shop who went to see the ombudsman. It was mainly Bill[ Reese]'s treatment of Scott Woods, Mike[,] and Heather that prompted the group to go."); Pl. Exh. 14 (Rector Aff.) ¶ 8 ("[W]hen we met with Tom Alison and John Benton, there were 12-15 people and Angela Roybal was present.").

10

Although Mr. Reese "saw employees conducting meetings around the shop, [he] wasn't aware that [the issues were] EEO related until [he] met with Angela Roybal and Chandra Heilman in March." Pl. Exh. 24 (Reese Aff.) ¶ 7. Mr. Reese did not attend the March 25 meeting, but stated in his affidavit that Col. Alison

> informed me that [Mr. Cross] had written several letters to the Secretary of the Smithsonian and Chandra [Heilman] stating that I carried a gun and threatened employee[s'] lives. He also showed me a copy of the [March 5] letter that was sent to the Secretary. The letter also stated that several employees were on an around the clock watch of Heather Hutton.

*Id.* Mr. Reese added: "[W]henever I met with Chandra and Angela [Roybal] they focused on the allegations of sexual harassment by Heather Hutton, not alleged harassment of Michael Cross." *Id.*

Throughout the remainder of March 2002, Ms. Heilman and Ms. Roybal interviewed various Garber employees about the problems at the facility. Pl. Exh. 32 (Cross Aff.) ¶ 32. The record contains a March 21 email from the NASM Ombudsman, Mr. Benton, to Ms. Heilman that read:

> Subject: Per our conversation
>
> Chandra,
>
> Here's my thinking:
>
> Inappropriate Managerial Behavior over a long period of time (Management by Intimidation & all the other issues)
> Problems dealing with Women (alleged discrimination)
> Preferential Treatment of Employees (alleged punishment and reward of employees)
> Safety Issues (placing employees in harm's way)
> Ineffective Leadership (morale & esprit de corps issues, not responding to employee concerns)
>
> Let me know if we need to discuss or you have others. Thanks, JB

11

Pl. Exh. 7G (Mar. 21, 2002, email from Mr. Benton to Ms. Heilman).  Though a bit cryptic, this email appears to summarize Mr. Benton's and Ms. Heilman's understanding of the Garber employees' complaints about Mr. Reese.

The record suggests that, while the investigation progressed, the atmosphere in the shop grew fractious as the employees split into pro-management and anti-management camps.  It also suggests that Mr. Cross was viewed by many as the unofficial "leader" of the anti-management group — and by management as a "troublemaker" — due to his increasingly vocal efforts. Meanwhile, Mr. Cross continually updated Ms. Heilman on what he perceived to be the disintegrating work environment in the Garber Facility.  Pl. Exh. 7H (Mar. 17, 2002, email from Mr. Cross to Ms. Heilman); Pl. Exh. 7I (Mar. 26, 2002, 7:26 a.m. email from Mr. Cross to Ms. Heilman); Pl. Exh. 7J (Mar. 26, 2002, 7:39 p.m. email from Mr. Cross to Ms. Heilman).  These emails did not specifically complain of sexual harassment or discrimination, although one noted that "Mr. Alison and Mr. Reese beg[a]n attacking Miss Hutton (threatened with firing by Mr. Reese if she files complaint)."  Pl. Exh. 7H at 1 (emphasis deleted).  Each contained a request that it be forwarded to Ms. Roybal as the EEO representative.

At some point, Gen. Dailey, the NASM Director, asked Dr. Ted Maxwell, Associate Director for Collections and Research at NASM, to meet with the Garber employees to determine whether any additional issues needed to be addressed.  Pl. Exh. 28 (Dailey Aff.) ¶ 10.  On March 28, Ms. Roybal sent an email to Mr. Benton that read as follows:

> Since the meeting Ted [Maxwell] had with Tom [Alison] and Bill [Reese] at the Garber facility I have been receiving telephone calls and e-mails from the staff.  According to them Tom has been meeting with certain staff members and has made comments they find threatening.   Some intend to file EEO complaints against

"management" because they do not believe that their issues have been taken seriously nor [sic] are being addressed.  The safety coordinator stated that he has brought concerns regarding the use of drugs to management[']s attention and that nothing has been done.

While I do not believe in "giving in" to their demands, I do believe that both sides have to meet half way.  They are of the belief that senior management fully supports Tom [Alison] and Bill [Reese] and some are not willing to meet with them unless they have a third party present.  They have also expressed an interest in contacting Sheila Burke [then the Smithsonian's Undersecretary for American Museums and National Programs].

Any ideas?

Pl. Exh. 7K (Mar. 28, 2002, email from Ms. Roybal to Mr. Benton).

On April 4, Gen. Dailey again met with the Garber employees to hear their concerns. Pl. Exh. 18 (McCombs Aff.) ¶ 4.  At this meeting, Gen. Dailey reportedly "acknowledged Bill[ Reese]'s prejudices toward women."  Pl. Exh. 10F (Apr. 4, 2002, email from Ms. Hutton to Ms. Roybal); *see* Pl. Exh. 18 (McCombs Aff.) ¶ 9 (noting that, in an April meeting, Gen. Dailey acknowledged that "Bill [Reese] has a problem with women").  The same day, Mr. Cross got into a "shouting match" with Steven Kautner, another Museum Specialist, over whether Mr. Kautner was "conspiring with management to get [Mr. Cross] fired in order to open up a permanent slot" that Mr. Kautner, who was hired on a temporary basis, could take.  Pl. Exh. 20 (Kautner Dep.) at 44.  Mr. Kautner testified that "personal slurs" were exchanged during the course of the argument, and that he felt "intimidated" by Mr. Cross.  *Id.* at 44, 46.  The next day, Messrs. Alison and Reese pressed Mr. Kautner to write a statement describing the incident, but Mr. Kautner refused, sensing that management intended to use the statement to target Mr. Cross.  *Id.* at 52-55.  Col. Alison composed a Letter of Counseling intended "to document counseling that [Mr. Cross] received on the morning

13

of April 4" as a consequence of his "disruptive behavior" — namely, the "verbally abusive conversation" with Mr. Kautner and an April 3 phone call in which Mr. Cross reportedly attempted to persuade Mr. Curry to "join [his] cause against the Unit Chief, Mr. Reese."  Pl. Exh. 29.  The Letter of Counseling, dated April 5, was unsigned.  Col. Alison testified that he never gave it to Mr. Cross.  Pl. Exh. 4 (Alison Dep.) at 223; *see also* Pl. Exh. 62 (Dec. 6, 2002, email).

On April 10, Gen. Dailey met with the Garber employees for a third time.  Pl. Exh. 18 (McCombs Aff.) ¶ 4.  At this meeting, he announced a reorganization of the management structure at the Garber Facility, under which Bernard Poppert and Karl Heinzel would assume direct supervisory responsibility over the workers on the shop floor.  *Id.*; Pl. Exh. 28 (Dailey Aff.) ¶ 10. Mr. Reese's post-reorganization role is unclear.  One worker, Anne McCombs, was left with the impression that he would supervise Messrs. Poppert and Heinzel, Pl. Exh. 18 (McCombs Aff.) ¶ 4, while Gen. Dailey indicated that he "relieved Mr. Reese of his supervisory responsibilities" and "instructed [him] to apologize to the employees," Pl. Exh. 28 (Dailey Aff.) ¶ 10.

The decision to terminate Mr. Cross was made during a meeting held in Gen. Dailey's office on April 10, presumably before Gen. Dailey met with the Garber staff.  Present at that meeting, besides Gen. Dailey, were Mr. Lopez, Dr. Maxwell, Col. Alison, Mr. Reese, and Elizabeth Scheffler, Associate Director for Operations and Administration at NASM.  Pl. Exh. 4 (Alison Dep.) at 208, 258, 266.  Gen. Dailey was the ultimate decisionmaker, and based his decision on a recommendation from Col. Alison.  Pl. Exh. 15 (Dailey Dep.) at 12-13.  *But see* Pl. Exh. 4 (Alison Dep.) at 257 ("A. I wouldn't use the term 'recommend.' Q. What term would you use? A. Agree."). On April 11, Col. Alison sent Ms. Scheffler and Mr. Maxwell an email stating, "I can come to no other conclusion than that we should move forward with our agreed upon tack, which is to separate

both individuals duri[]ng their probationary period." Pl. Exh. 56 (April 11, 2002, email). Attached

for comments was a draft "Discharge Letter." *Id.* Dr. Maxwell replied, "Sounds appropriate to me.

If they ask for documentation about why they are being discharged, tell them it is not in their best

interest to have a hard copy, as it may not help them in future job searches[] — just a thought." *Id.*

Col. Alison terminated Mr. Cross on April 12. Ms. Hutton was terminated on the

same day. The final version of the Discharge Letter issued to Mr. Cross stated: "It is my decision

to separate you during your probationary period because of your poor attendance record and

misconduct on your part." Pl. Exh. 6 (Apr. 11, 2002, Discharge Letter) at 1. In a memorandum

dated April 10 and appended to Mr. Cross's Probationary Report, Col. Alison elaborated on these

reasons. That memorandum stated:

> My evaluation is based on Mr. Cross's poor attendance record during
> his probationary period. He has used 162.5 hours of leave during the
> period. This situation, when projected into the future[,] does not
> mark Mr. Cross as an employee that can be depended on[,] and given
> the importance of the current effort by the Collections Division to
> prepare and move the collections to the Udvar-Hazy Center, this is an
> extremely important employee characteristic.
>
> Additionally, during the last thirty to sixty days Mr. Cross has
> become a disruptive force within his workplace. He has displayed
> unsatisfactory leadership potential by this disruptive behavior and
> has, in fact, been a counter-productive force concerning the important
> mission we have at hand.

Pl. Exh. 2 (Probationary Report) at 2. In his deposition, however, Col. Alison agreed that "Mr.

Cross'[s] attendance alone was not a sufficient reason to terminate him," and testified that "his

misconduct was the primary issue, and his attendance record was a secondary issue." Pl. Exh. 4

(Alison Dep.) at 300-01. Gen. Dailey testified similarly:

15

> Q. Was Mr. Cross's attendance enough of a justification [for] terminating [him] from the Smithsonian?
> A. Perhaps. However, my decision was based primarily on his behavior.
> Q. So Mr. Cross's behavior was the reason that you chose not to continue —
> A. Was the primary reason for the decision.

Pl. Exh. 15 (Dailey Dep.) at 80. When he was discharged, Mr. Cross had not depleted his allotted leave; in fact, he had a balance of 82.5 hours of annual leave and 9 hours of sick leave. Pl. Exh. 4 (Alison Dep.) at 402-04. Although there is evidence that Mr. Cross sometimes used leave from NASM to perform paid work elsewhere, *see, e.g.*, *id.* at 403, he had never been suspended, reprimanded, or counseled regarding his attendance, *id.* at 423-24.

Regarding the other reason for Mr. Cross's discharge — namely, misconduct or disruptive behavior — Gen. Dailey testified that, based on his understanding from Col. Alison, Mr. Cross had been "gathering support from individuals who[m] he was working with, and then intimidating others so that there was a divisiveness between the two portions or two factions out there that was disruptive to our production" and had been urging workers to "support him in terms of taking a position against the management." Pl. Exh. 15 (Dailey Dep.) at 31. Gen. Dailey viewed Mr. Cross as a "troublemaker." *Id.* at 137. The primary episodes of misconduct cited by management appear to be the March 5 email and the Kautner incident. *See, e.g.*, Pl. Exh. 4 (Alison Dep.) at 231-32.

Mr. Cross contacted an EEO counselor on April 16, 2002, Pl. Facts ¶ 32, and filed a formal EEO charge on June 20, 2002. That charge raised two distinct claims:

> The Agency has engaged in a pattern and practice of discriminating and harassing the Complainant because of his disability[,] Post Traumatic Stress Disorder (PTSD)[,] and later because of his EEO

activity when:

> a.  Since starting employment with the Agency in July 1999 through April 12, 2002, his supervisor, Bill Reese, would call him derogatory names such as "Nam Nut," "dumb ass," and "stupid" & would criticize the Complainant for joining the Marines Corp [sic] during the Vietnam War and going to combat, which combat caused the Complainant to suffer from PTSD.

> b.   After February 21, 2002, when the Complainant along with numerous agency officials contacted the Agency Ombudsman, Chandra Heilman, and EEO Counselor, Angela Roybal, to complain about, among other things, Mr. Reese's sexual harassment of coworker Heather Hutton[.]

Def. Exh. 3 (EEO Complaint) at 2.  Following a dispute before the Administrative Judge over who would perform an independent medical examination, Mr. Cross withdrew his request for a hearing before the EEOC, and the matter was remanded.  Pl. Facts ¶ 37; Pl. Exh. 54.  On March 18, 2004, Mr. Cross withdrew his claim of disability discrimination.  Pl. Facts ¶ 38.  On June 28, 2004, the Smithsonian issued its final decision denying Mr. Cross's retaliation claim.  *Id.*  Mr. Cross filed this action on July 27, 2004.

## II. LEGAL STANDARDS

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery show that, first, 'there is no genuine issue as to any material fact' and, second, 'the moving party is entitled to a judgment as a matter of law.'"  *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Fed. R. Civ. P. 56(c)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor; it is not permitted to make credibility determinations or weigh the

17

evidence. *Holcomb*, 433 F.3d 895 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000)).

Summary judgment is not a "disfavored procedural shortcut" but, rather, an aid to the "just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "The mere existence of *some* alleged factual dispute between the parties will not defeat summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted). "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Id.* "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322).

### III. DISCUSSION

Mr. Cross alleges that he suffered a hostile working environment, was discharged, and received negative references in retaliation for his complaints of "sexual harassment and gender-based discrimination against female employees" in the Garber Facility. Am. Compl. ¶ 34. Where, as here, the record contains no direct evidence of retaliation,[7] the Court applies the now-familiar

---

[7] Mr. Cross asserts that two pieces of evidence constitute direct evidence of retaliation. Pl. Opp'n at 32. First, Mr. Cross suggests that there is "extensive testimony that Gen. Dailey ordered Mr. Cross'[s] discharge because he considered Mr. Cross a 'troublemaker' after [his] EEO activity." *Id.* However, this assertion distorts Gen. Dailey's deposition testimony. Gen. Dailey did state that he saw Mr. Cross as a troublemaker, but in the context of explaining the type of disruptive behavior

burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Holcomb*, 433 F.3d at 901.  "First, a plaintiff must establish a prima facie case of retaliation; if she meets that burden, the employer must articulate a legitimate nonretaliatory reason for its action; finally, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation." *Id.*

### A. Count One: Hostile Work Environment

In Count One, Mr. Cross alleges that, in retaliation for his vocal opposition to gender-based discrimination and sexual harassment at the Garber Facility, his supervisors "harassed [him] with unreasonable, severe[,] and pervasive actions that created a hostile and abusive working environment, substantially altering [his] conditions of employment."   Am. Compl. ¶ 36. Specifically, he states that supervisors "frequently yelled at him and belittled him in front of other employees and otherwise treated him like a pariah in the workplace." *Id.* ¶ 22.  His complaint is devoid of specifics.  Defendant argues that such spare allegations are insufficient as a matter of law

---

that Defendant asserts was cause for Mr. Cross's termination; Mr. Daily did *not* say that he viewed Mr. Cross as a troublemaker because of any EEO activity. *See* Pl. Exh. 15 at 137.  Thus, the Court fails to see how this is direct evidence of retaliatory intent. *Cf. Forman v. Small*, 271 F.3d 285, 299 (D.C. Cir. 2001) (finding direct evidence where supervisor stated that he did not forward plaintiff's complaint because plaintiff had filed an EEO charge).

Second, Mr. Cross suggests that "Mr. Alison said Mr. Cross engaged in misconduct when Mr. Cross accused Mr. Alison of harassment, which Mr. Dailey couched as a 'counseling' warranting Mr. Cross'[s] discharge."  Pl. Opp'n at 32.  A review of Col. Alison's deposition testimony clarifies that, at some point, Col. Alison discussed the Kautner incident with Mr. Cross; Col. Alison viewed this discussion as "counseling" while Mr. Cross viewed it as "harassment" and said so. *See* Pl. Exh. 4 (Alison Dep.) at 219-21.  But Mr. Cross's statement that he felt harassed by his supervisor's attempt at counseling is not itself a protected activity, and though the incident may have led, in part, to his termination, *see id.* at 221, the Court fails to see how the statement constitutes direct evidence of retaliation for Mr. Cross's complaints about sexual harassment in the workplace.

to establish a hostile working environment, and specifically suggests that the behavior Mr. Cross finds objectionable is not objectively hostile or abusive but, rather, the stuff of ordinary workplace disputes.  *See* Def. Mem. at 16-17.

In the D.C. Circuit, "a hostile work environment can amount to retaliation under Title VII."  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006).  To prevail on such a claim, however, Mr. Cross must show that he was subjected to "discriminatory intimidation, ridicule, and insult of such severity or pervasiveness as to alter the conditions of his employment and create an abusive working environment."  *Id.* (internal quotations and alterations omitted).  As the Supreme Court explained in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993), whether an environment is "hostile" or "abusive" can be determined only by examining all the surrounding circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

The inquiry under *Harris* has both an objective and a subjective component.  *See id.*  Conduct that is "not severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive" is beyond Title VII's purview; likewise, "if the victim does not subjectively perceive the environment to be abusive . . . there is no Title VII violation."  *Id.*  As to the objective component — the main issue for present purposes — neither the "mere utterance of an epithet which engenders offensive feelings in a employee," *id.*, nor the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998), are sufficient to implicate Title VII.  Rather, conduct must be so extreme as to "amount to a change in the terms and conditions of

employment." *Id.*

Mr. Cross's conclusory allegation that he was "subjected to continuing, severe[,] and pervasive harassment, led by Mr. Allison," Pl. Opp'n at 24, is met with little record support. One of Mr. Cross's affidavits states, in equally conclusory terms, that he was subject to "constant harassment and intimidation by Mr. Alison," Pl. Exh. 32 (Cross Aff.) ¶ 32. However, a plaintiff cannot survive summary judgment by merely repeating the allegations of his complaint in affidavit form. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of a complaint or answer with conclusory allegations of an affidavit."); *see also* Fed. R. Civ. P. 56(e) (the defending party's affidavits must set forth "specific facts" demonstrating a genuine trial issue). The few concrete examples of "harassment" to which Mr. Cross points consist of: (1) an email from Mr. Cross to Ms. Heilman, dated March 17, 2002, stating without elaboration that, on the previous Thursday, he was "pressur[ed]" and "targeted . . . by Mr. Alison for intimidation and subtle harassment," Pl. Exh. 42; (2) testimony from coworker David Wilson that, on an unspecified number of occasions, Mr. "Alison would come into [Mr. Cross's] work area and confront him[,] . . . getting up in [his] face in a hostile manner," Pl. Exh. 12 (Wilson Aff.) ¶ 8; and (3) testimony from coworker Steven Kautner that Mr. Reese once "got in [Mr. Cross's] face . . . and you could tell it was not a pleasant conversation they were having," Pl. Exh. 20 (Kautner Dep.) at 33, and that on three or four other occasions, when he saw Col. Alison and Mr. Cross "talking quite sternly at each other," he got the impression that Col. Alison was "telling [Mr. Cross] off or yelling at him," *id.* at 65.

The Court concludes that this evidence, without more, is insufficient to establish that Mr. Cross's workplace was so permeated with "discriminatory intimidation, ridicule, and insult of

such severity or pervasiveness as to alter the conditions of his employment and create an abusive

working environment." *Hussain*, 435 F.3d at 366; *see, e.g.*, *George v. Leavitt*, 407 F.3d 405, 408-09,

416-17 (D.C. Cir. 2005) (finding no hostile work environment where plaintiff, on different

occasions, was told to go back where she came from, shouted at, and told she should never have been

hired; and where supervisor, on different occasions, told staff to keep their distance from plaintiff,

"lost control" during a one-on-one meeting, and "violently and angrily" kicked a box after a different

one-on-one meeting).[8]   Simply put, these isolated episodes, though not commendable, are not

sufficiently severe to implicate Title VII protections.[9]   The Court will grant Defendant's motion to

dismiss as to Count One of the Amended Complaint.

## B. Count Two: Retaliatory Discharge

In Count Two, Mr. Cross alleges that he was discharged in retaliation for his vocal

opposition to sex-based discrimination.  *See* Am. Compl. ¶ 38-39.  To establish a prima facie case

---

[8] The Supreme Court's recent decision in *Burlington N. & Santa Fe Rwy. Co. v. White*, 126 S. Ct. 2405, which held that, to support a retaliation claim, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse" — or, otherwise put, that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" — does not change this result.  *Id.* at 2415.  The Court in *Burlington Northern* emphasized the distinction between "material" and "trivial" harms, explaining that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*  Those are precisely the sort of annoyances about which Mr. Cross complains in Count 1.

[9] The Court notes that, in his opposition to Defendant's Motion to Dismiss, Mr. Cross does not rely on the allegations in Count 1 of his original Complaint, abandoned in his Amended Complaint, that he was denied "travel opportunities, use of particular tools, work on desirable projects, and opportunities to earn compensatory time." Orig. Compl. ¶ 33. In addition, to the extent that Mr. Cross relies for this Count on his allegation that he was treated as a "pariah" in the workplace, the Court observes that the record is replete with examples of similar conduct toward all employees, not just Mr. Cross.  In fact, Mr. Reese's apparent habit of giving the "silent treatment" to disfavored workers was one of the workers' central complaints from the outset.  Thus, as to this particular allegation, Mr. Cross's claim would also fail for want of evidence of causation.

of retaliation, Mr. Cross must present evidence that (1) he engaged in activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) the adverse action was causally related to the exercise of his rights. *Holcomb*, 433 F.3d at 901-02. The Government argues that Mr. Cross has failed to demonstrate that he engaged in protected activity, Def. Mem. at 11-14, and, alternatively, that he has failed to show a causal connection between any protected activity and his discharge, Def. Reply at 16-23. The Court cannot agree.

Mr. Cross's first memorandum to the Smithsonian's Ombudsman, Ms. Heilman, specifically complained of "[s]exual . . . harassment and biasing." His later communiques, though not always invoking those "magic words," provided supporting details and requested that the EEO representative, Ms. Roybal, be notified. *Cf. Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). These allegations are sufficiently specific to qualify as protected activity. *See id.* As to causation, the D.C. Circuit has held that, for purposes of establishing a prima facie case, "a close temporal relationship" between the protected activity and the adverse action "may alone establish the required causal connection." *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003); *see also id.* at 525 n.6 (citing cases). Here, Mr. Cross's protected activity and his discharge were nearly overlapping. In addition, there is evidence that the decisionmaker, Gen. Dailey, and the subordinate upon whose recommendation he relied, Col. Alison, were aware of Mr. Cross's contacts with Mss. Heilman and Roybal. *See George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). The Court thus finds that Mr. Cross has established a prima facie case.

The Government having articulated a legitimate, nonretaliatory reason for discharging Mr. Cross — namely, poor attendance and misconduct — the burden shifts back to Mr. Cross to "establish that the reason asserted by [his] employer is pretext for retaliation." *Holcomb*, 433 F.3d

23

at 901.  To shoulder his "ultimate burden" at the summary judgment stage, Mr. Cross "must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason."  *Id.* at 897.  He can meet this burden either directly, by persuading the Court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence.  *Carpenter v. Fannie Mae*, 174 F.3d 231, 235 n.3 (D.C. Cir. 1999).

As the record now stands, although there is some evidence of misconduct, there is also some evidence that the Government has retreated from its original, perhaps primary, reason for terminating Mr. Cross, poor attendance.  *See Sw. Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995) ("[J]ury can infer pretext and thus discrimination where [the] employer provides shifting and inconsistent explanations for its action.") (citing *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994)); *see also Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc) ("[T]he plaintiff can attempt to show that the employer's explanation was fabricated after the fact by showing that it contradicts other contemporaneous accounts of the employer's decision.").  In short, the facts with regard to Mr. Cross's behavior and his employer's motivations for terminating him are dramatically in dispute, and a jury, which is permitted to make the necessary credibility determinations, must sort them out.  The Government's motion for summary judgment as to Count Two of the Amended Complaint must therefore be denied.[10]

---

[10] The Government also argues that Mr. Cross's protected activity was "so extreme, disruptive, and [full of] such false and malicious accusations" as to fall outside the protections of Title VII.  "Behavior that appears to fall within the protection of [Title VII], and so, for purposes of evaluating whether [a] plaintiff has made out a prima facie case, is presumed to be protected, may, after the government . . . has put on its evidence, ultimately be determined to be — at least in part — unprotected."  *Barnes v. Small*, 840 F.2d 972, 977 (D.C. Cir. 1988) (citing *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981), and *Pendleton v. Rumsfeld*, 628 F.2d 102, 107

### C.  Count Three: Retaliatory Negative References

In Count Three, Mr. Cross alleges that, after his discharge, certain Museum managers — namely, Mr. Resse, Mr. Poppert, Russell Lee, and one Mr. Paper — provided "negative, disparaging information about [him] in retaliation for [his] EEO activity," causing him to be denied, *inter alia*, the position of Helicopter Maintenance Mechanic with a company called America Rising. Am. Compl. ¶ 41.  Defendant argues that Mr. Cross is barred from raising this claim for failing to exhaust his administrative remedies.

The particulars of Mr. Cross's  formal EEO charge read in their entirety:

The Agency has engaged in a pattern and practice of discriminating and harassing the Complainant because of his disability[,] Post Traumatic Stress Disorder (PTSD)[,] and later because of his EEO activity when:

a.  Since starting employment with the Agency in July 1999 through April 12, 2002, his supervisor, Bill Reese, would call him derogatory names such as "Nam Nut," "dumb ass," and "stupid" & would criticize the Complainant for joining the Marines Corp [sic] during the Vietnam War and going to combat, which combat caused the Complainant to suffer from PTSD.

b.   After February 21, 2002, when the Complainant along with numerous agency officials contacted the Agency Ombudsman, Chandra Heilman, and EEO Counselor, Angela Roybal, to complain about, among other things, Mr. Reese's sexual harassment of coworker Heather Hutton:

a. On March 5, 2002, Mr. Reese's Supervisor, Tom Allison [sic], approached me and said words to the effect that he me held [sic] and Ms. Hutton responsible for the complaints presented to the Ombudsman and the EEO Counselor against

_____

(D.C. Cir. 1980)).  Here, the facts surrounding Mr. Cross's behavior, including whether he made false or malicious statements, and the degree to which it impacted his employer's legitimate interests, are hotly disputed.  On the present record, the Court is unable to decide whether the manner in which Mr. Cross pursued his complaints deprives him of Title VII protection.

Mr. Reese and that he "would get us."

b. On March 12, 2002, Mr. Allison began spreading rumors among Agency employees that the Complainant was trying to get Mr. Reese fired, that the Complainant was trying to get the [sic] Mr. Reese's position, and that the Complainant was not the caliber of craftsman that the Agency required.

c. On or about April 2, 2002, Mr. Allison falsely accused the Complainant of attempting to intimidate coworkers John Curry and Steve Kautner.

d. On April 4, 2002, Mr. Allison's supervisor John Dail[e]y told me that he fully supported Messrs. Reese and Allison and that if I felt that the work environment at the agency was hostile that I should leave.

e. On April 12, 2002, Mr. Allison removed me from service.

Def. Mot. Exh. 3. Mr. Cross's EEO charge also indicates that April 12, 2002, was the date on which the most recent episode of discrimination took place. *Id.*

The particulars of Mr. Cross's EEO charge make no reference whatever to negative retaliatory references. Mr. Cross argues, however, that "[t]he text of [his] June 20, 2002[,] complaint is irrelevant" because he "raised retaliatory negative references during the course of the EEO investigation, providing Defendant with ample notice of this claim." Pl. Facts ¶ 36; *see also* Pl. Mem. at 26-28, 46-48. The "ample notice" to which Mr. Cross points is a one-paragraph reference in a ten-page affidavit, signed December 6, 2002, that was apparently submitted during the course of the EEOC's investigation. Pl. Exh. 32 (Cross Aff.) ¶ 43. The pertinent paragraph describes the outcome of a mock reference check authorized by Mr. Cross on April 18, 2002, *see id.*, and conducted on or before April 24, 2002, *see* Pl. Exh. 46, which revealed that Mr. Reese gave him a positive review, Col. Alison and coworker Jeff Mercer declined to comment, and Mr. Lee said his

work on a particular research project was "substandard" and "not very good" — comments that Mr.

Cross characterizes as "totally damaging." Pl. Exh. 32 (Cross Aff.) ¶ 43; Pl. Exh. 46.[11]

"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are

like or reasonably related to the allegations of the charge and growing out of such allegations." *Park*

*v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995). The D.C. Circuit has explained that,

> [a]t a minimum, the Title VII claims must arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination. The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision. Although it is true that the administrative charge requirement should not be construed to place a heavy technical burden on individuals untrained in negotiating procedural labyrinths, it is also true that the requirement of some specificity in a charge is not a mere technicality. A court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process.

*Id.* (citations, footnote, and internal quotation marks omitted). Here, Mr. Cross's EEO charge not

only lacks the words "negative references," but also lacks any factual allegations supporting such

a claim. *See id.* at 908. In fact, although his retaliatory negative discharge claim arose, at the

earliest, sometime between April 18 and 24, 2002, his EEO charge clearly states that the last episode

of discrimination took place on April 12, 2002. And, the EEO charge does not name Mr. Lee, the

one coworker who Mr. Cross now claims provided a negative reference. Without some hint in the

---

[11] Mr. Cross notes that, in addition to this mock reference check, he commissioned a second such check during summer 2003. Pl. Mem. at 27. As evidence of this fact, however, he points only to an affidavit signed February 22, 2005, to which the results of said reference check are appended. However, given the late date of this affidavit, the Court has no basis to conclude that this information was before the EEOC, which issued its final decision on June 28, 2004. Pl. Facts ¶ 38. Thus, this information cannot have constituted notice to the EEOC of Mr. Cross's claim of retaliatory negative references.

EEO charge that negative references were provided, that conduct after April 12, 2002, was at issue, or that Mr. Lee had acted improperly, the Court cannot conclude that Mr. Cross's claim of retaliatory negative references would "arise from the administrative investigation that can reasonably be expected to follow" his EEO charge.  *See id.*

Mr. Cross protests that it is enough that he brought the negative reference issue to the attention of the EEO at *some* time during the course of the investigation; this he accomplished, in his view, by way of the aforementioned single-paragraph reference in his ten-page December 6, 2002, affidavit.  While he finds a modicum of support for this position in the case law, the Court ultimately finds it unpersuasive.  As Mr. Cross notes, the D.C. Circuit in *Brown v. Marsh*, 777 F.2d 8 (D.C. Cir. 1985), stated:

> As we explained in *President v. Vance*, the relevant inquiry is not whether the complainant has filed a detailed statement spelling out precisely his objections but whether the actions he did take were adequate to put the [agency] on notice.  Moreover, we have suggested that notice may be adequate where a claim is brought to the agency's attention "during the course of the administrative proceeding" and "before it issued its final decision" even if the argument or claim is not clearly set out in the complaint.

*Id.* at 13 (citations and internal quotation marks omitted; alteration in original).  For a number of reasons, the quoted text does not salvage Mr. Cross's negative references claim from nonexhaustion.  First, it bears note that *Brown* says "notice *may* be adequate" under the described circumstances, *id.* (emphasis added), not that notice invariably *is* adequate; in other words, the fact that a claim is brought to the agency's attention during the course of a proceeding and before a final decision is issued is not in all cases sufficient to render notice adequate.  *See id.*  Second, this quotation ignores the fact that both *Brown* and *President* evince a reluctance to create procedural traps for unwary

plaintiffs.  *See Brown*, 777 F.2d at 13 ("EEO complaints are to be liberally construed since very commonly they are framed by persons unschooled in technical pleading.") (citation and internal quotation marks omitted); *President v. Vance*, 627 F.2d 353, 361 (D.C. Cir. 1980) ("We think so strict a requirement would impose far too heavy a burden upon a lay complainant . . . ."). However, unlike the lay complainants in *Brown* and *President*, *see Brown*, 777 F.2d at 9, 11; *President*, 627 F.2d at 361, Mr. Cross has at all times been represented by counsel, including when he filed his administrative charge with the EEOC.  Def. Exh. 3.

Third, the text Mr. Cross quotes from *Brown*, while technically accurate, fails to place either *President* or *Brown* in proper factual context.  The defendant in *President* argued that the plaintiff failed to exhaust his administrative remedies because his administrative charge "did not expressly request promotion from GS-12 to GS-13 as part of its prayer for relief."  *President*, 627 F.2d at 360-61.  The court noted, however, that the EEO charge did "allege[] that the [defendant] pursued a policy of not promoting minority officers . . . above the GS-12 level, and that [plaintiff] himself had been victimized by a biased performance evaluation report."  *Id.* at 361.  The court concluded that it "strains credulity to suggest that these straightforward charges were not sufficient to alert an experienced and conscientious equal employment opportunity officer to a claim that [Mr.] President had been discriminated against in his promotional opportunities."  *Id.*

Likewise, the defendant in *Brown* argued that the plaintiff failed entirely to submit an administrative charge complaining of his nonselection as a GS-8 Supervisory Space Utilization Specialist.  *Brown*, 777 F.2d at 14.  The defendant based this argument on the affidavit of one employee without personal knowledge of the case, who stated that he once inspected the EEO file but found no such complaint.  *Id.*  The record suggested, however, that several other documents had

29

been misdelivered or mislaid and that the EEO file was in "complete disarray"; indeed, the court noted that a passing reference in the briefs (to a portion of the administrative record not before the court) "appear[ed] to create a reasonable inference that such a complaint was in fact filed." *Id.* In view of the these deficiencies, and the plaintiff's repeated complaints of a continuing pattern of discriminatory nonselection, the court found that the defendant failed to meet its burden to establish nonexhaustion. *Id.* Taken together, then, *President* and *Vance* — if not *sui generis* — stand at most for the proposition that, depending on the circumstances, a plaintiff who complains of discriminatory nonpromotion may not be required to set forth in the text of his administrative charge the specific title, position, or pay grade he was allegedly wrongly denied.

       Fourth, to the extent that *President* and *Vance* might be read to relax the notice standards in limited circumstances, the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), leaves them with questionable vitality. The plaintiff in *Morgan* brought claims of discrimination, retaliation, and hostile work environment, relying in part on discriminatory acts that occurred more than 300 days before he filed his administrative charge with the EEOC. *Id.* at 104. The Court confronted the question whether claims based on acts preceding that cut-off date were time barred, based on the statutory mandate that, as a prerequisite to suit, an EEO charge be filed no later than 300 days after the alleged unlawful employment practice occurred. *Id.* at 105. Distinguishing discrete acts, including retaliation, from hostile work environment claims, the Court first explained that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act." *Id.* at 113. Accordingly, the Court held: "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy

to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.* at 114.  Although in *Morgan* this rule operated to bar claims based on discrete acts occurring before the 300-day period before the EEO charge, courts have likewise applied it to claims based on discrete acts that took place after the filing of an EEO charge.  *See, e.g.*, *Martinez v. Potter*, 347 F.3d 1208, 1210-11 (10th Cir. 2003) ("The rule is equally applicable . . . to discrete claims based on incidents occurring after the filing of Plaintiff's EEO complaint."); *Adams v. Mineta*, No. 04-856, 2006 U.S. Dist. LEXIS 5783, at *12-13 (D.D.C. Feb. 16, 2006).

The circumstances are slightly different here, in that Mr. Cross's claim of retaliatory negative references arose between April 18 and 24, 2002, Pl. Exh. 32 (Cross Aff.) ¶ 43; Pl. Exh. 46 — before he submitted his administrative charge on June 20, 2002, Pl. Facts ¶ 33.  However, as already discussed, that charge omitted mention of any retaliatory references and, in fact, explicitly stated that the latest episode of discrimination took place on April 12, 2002.  Def. Mot. Exh. 3.  The Court thus agrees that *Morgan* controls here, and requires that Mr. Cross's claim of negative retaliatory references, which was a discrete discriminatory act, be separately exhausted.

Accordingly, the Court will grant Defendant's motion for summary judgment as to Count Three of the Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment as to Counts 1 and 3 of the Amended Complaint, deny it as to Count 2, and defer decision on Counts 4 and 5 until Plaintiff has had an opportunity to respond to Defendant's motion to dismiss them.  *See supra* n.2.  The Court will address Defendant's argument that the remedies available to

Plaintiff are limited by after-acquired evidence in a forthcoming decision.   A separate Order

accompanies this Memorandum Opinion.

Date: September 29, 2006                              _____/s/_____

                                                     ROSEMARY M. COLLYER
                                                     United States District Judge